the jury and court were led to believe there were uncountable losses, and had no problem proceeding to sentencing. Worse, counsel made these statements in Mr. Tanaka's absence, since counsel had told Tanaka to stay away from the Vilar sentence proceedings. But Mr. Colton was present, and discussed these substantive matters without Tanaka's hearing or input, forfeiting Mr. Tanaka's opportunity to discuss the Ross report.

Counsel abdicated his client's interests. There was nothing strategic about failing to learn about the numbers and advocate for his client. The numbers were in Mr. Tanaka's favor. Preparing for "forfeiture" was something that a reasonable lawyer should have done. Mr. Colton learned this only after the fact.[24]

If final evidence of a failure of a strategic reason on counsel's part is needed, sadly (for his client), at a presentation at a Lawline CLE conference on July 1,

---

[24]Fortuitously, counsel has learned that, in a case Mr. Colton took on shortly after the verdict against Mr. Tanaka in this case and during the period leading up to Tanaka's sentencing proceedings, Mr. Colton apparently began to understand criminal forfeiture -- in a different criminal case, also involving securities fraud and forfeiture allegations. *United States v. Walsh*, 09cr722(MGC) (SDNY). In *Walsh*, the co-defendant's counsel moved for a release of restrained assets prior to trial. Shortly thereafter Mr. Colton fought for the release of assets belonging to his client Mr. Walsh, being held pursuant to freeze orders in parallel SEC and CFTC cases. Though Mr. Colton learned about forfeiture, he lost the motion for release of millions of dollars, failing to overcome tracing. (See 09cr722 DOC 79, Mr. Colton's motion for reconsideration of the denial of release of frozen assets.) Mr. Colton's own conduct of the *Walsh* case indicates that a reasonable attorney in such cases would have defended Gary Tanaka's purportedly forfeitable assets more vigorously – like learning what Mr. Tanaka's expert, David Ross, found, when hired to evaluate assets after Mr. Colton declined to undertake the project.

2011 on "parallel prosecutions" of criminal and SEC cases, Mr. Colton admitted that he did not *know* about "forfeiture.". When another presenter was about to discuss asset forfeiture and how it intersects with SEC freeze orders, another stated he would be taking notes because he was confused about asset forfeiture. Mr. Colton stated: "[I]f I wasn't on camera I'd admit being confused about that too."

An effective investigation – a defense not constrained by how the prosecutor frames the case -- would have provided the defendants "with a trial significantly different than [h]e might have received if represented by a competent attorney." *Williams v. Washington*, 59 F.3d 673, 682-685 (7th Cir. 1995) ("Counsel's lack of familiarity with the case, combined with his failure to investigate, provided [the defendant] with a trial significantly different than she might have received if represented by a[n effective] attorney.") The Court should vacate the convictions.

- *Counsel failed to ask for "reliance" hearings as to "loss" and "restitution"*:

In *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006), the Court of Appeals ruled that, in determining the issue of [loss] causation for restitution purposes, the principles governing civil securities fraud cases may be applied. 446 F.3d at 136-37. As the court stated in Reifler: ""To prevail in a civil action under [Rule 10b-5], a plaintiff is required to prove, inter alia, that he was a buyer or a seller of the securities in question and that the defendant made a material misrepresentation, or omitted a material fact as to which disclosure was required, <u>on which the plaintiff</u>

relied." (Emphasis added).   446 F.3d at 135

Under the guidelines, "[a]ctual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)). This definition "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." U.S.S.G. App. C, Vol. II at 178, Amend. 617 (Nov. 1, 2001); *see United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014) ("[Section] 2B1.1 incorporates and requires both factual or 'but for' causation and legal or foreseeable causation."); *United States v. Peppel*, 707 F.3d 627, 643-44 (6th Cir. 2013) (recognizing that, to establish actual loss under § 2B1.1, the government must "establish both cause in fact and legal causation by a preponderance of the evidence").

A victim's losses may be included in a restitution awards arising from fraud only if the victim *actually relied* on defendants' fraudulent conduct or misrepresentations.   *United States v. Farano*, 749 F.3d 658, 666 (7th Cir. 2014).

Counsel was ineffective for failing to seek a hearing to hold the government to its burden of proving "loss" and "restitution" numbers.  Defendants should have had an opportunity to show that long-time clients and Vilar "friends" Mayer and Cates did not "rely" on anything said about the investment, whatever the offense

conduct may have turned out to be.

Indeed, the superseding indictment *charged* that Cates had "relied" on "Vilar's false and fraudulent representations regarding the SBIC investment"; counsel should have asked for a jury charge and litigated "reliance" at the trial.

Had counsel done so, the Court (and jury) would have been exposed to the enormous amount of impeachment material demonstrating Cates' cozy alliance with Vilar. His investment successes, not his words, were "material" to Lily Cates and to the world that adored Vilar when he was making money for them.

While trial counsel concededly asked for (and was denied) a "reliance" instruction at trial, which was rejected (and the rejection affirmed), "reliance" is a necessary finding for "loss" and restitution determinations. *See United States v. Ebbers*, 458 F.3d 110, 126-27 (2d Cir. 2006) (recognizing that reliance can be shown for loss calculation purposes under §2B1.1 by offering evidence to demonstrate "express reliance on the accuracy of the [fraudulent] financial statements").

Counsel's failure to press for "reliance" in sentencing caused the forfeiture of their opportunity to establish that their clients did not rely on Vilar's posturing in purchasing their Amerindo Panama investments.

- *The SEC's withholding of material that induced it to withdraw its charge that the SBIC investment was a "sham" constituted a Brady/Giglio errors. Defendants were deprived of Due Process when the government, acting on the false premises that it did not correct, held defendants' money and made it impossible for them to defend.*

Due Process violations infected the jointly-effectuated proceeding. *See United States v. Mahaffy,* 693 F.3d 113, 119 (2d Cir. 2012) (failure to turn over SEC material from a parallel case, which was in fact a "joint investigation," resulted in the ordering of a new trial for *Brady* violations). Because of the failure to correct the false impressions that underlay this case, the jury got the impression that Amerindo Panama – funds of which have been used to pay over $54 million to its clients with $27 million remaining – was a "sham" used to defraud the clients.

A *Giglio* error, a species of *Brady* error, occurs when a prosecutor makes "explicit factual representations" to the court or "implicit factual representations to the jury," knowing that those representations were false. *United States v. Alzate,* 47 F.3d 1103, 1110 (11th Cir. 1995). The government's summation, its position on appeal, urged the jury to convict based on the notion that the SBIC investment, and Amerindo Panama itself, were shams.

Defense counsel failed to defend against these assertions. But the government had an independent obligation not to allow conviction on false premises. *Mahaffy* requires a new trial.

- ***Defendants were deprived of Due Process in this joint investigation***

Defendants found out only after the fact that they were deprived of their management rights and their property at a proceeding, on June 1, 2005, of which they were not notified, and as to which they had no opportunity to defend.

Due process requires not simply a hearing – even in a civil case -- but a meaningful adversary review of the "factual basis" for adverse government action. *Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004).

In this joint investigation context, the failure to bring the incarcerated defendants, jailed across the street at the MCC, to the SEC injunction hearing worked a Due Process violation. Further Due Process violations on the part of the SEC are detailed in Appellants' brief on appeal in the SEC case, 14-2425.

## CONCLUSION

The Court should vacate the convictions for ineffective assistance of counsel and because of Due Process violations in this joint investigation.

Dated: February 24, 2017

Alberto Vilar /s/ Vilar by Vivian Shevitz
Alberto Vilar by Vivian Shevitz

Gary Tanaka by Vivian Shevitz
Gary Tanaka by Vivian Shevitz

## POINT I

## INEFFECTIVE ASSISTANCE OF COUNSEL REQUIRES VACATUR

As this brief shows throughout, trial counsel failed to adequately prepare for trial; he failed to conduct the necessary review and analysis of documentary evidence, and to develop viable defense theories.

Just four months before the trial started, Mr. Vilar's trial counsel Harold Fahringer substituted into a case that had been pending for almost three years, and as to which a suppression motion had been granted in part by Judge Karas. (The ruling is in co-appellant Tanaka's Appendix). When he appeared, Mr. Fahringer promised Judge Sullivan (to whom the case had been reassigned) that he would be ready for trial, then set for September. He was overwhelmed by the amount of material he would have to review – huge volumes (including 40,000 pages of proposed government exhibits which were in TIFF form listed on an Exhibit List of 94 pages (A. 411-504) (a matter that raises Due Process concerns that we contend infected the trial herein warranting reversal in its own right[11]). Mr. Fahringer told Judge Sullivan, who had

_____

[11] There has been increasing litigation over this tactic; a district court in

36

**Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-1**

not been the judge at the time of the suppression hearings, that he could not be prepared, and asked for an Adjournment, (Letter July 20, 2008 to Judge Sullivan, A.248).    Except for a two-week extension (A.257, Order of July 31, 2008), the court denied time.    At the same time the court granted the government's motion for depositions of Amerindo employees in London in the weeks before trial.[12]

---

this Circuit recently ruled that the government must provide documents in a "native" PDF searchable form, not the useless TIFF-form that apparently is the U.S. Attorney's "standard." See Order in the Western District of New York, *United States v. Briggs,* 10cr184(s) (Scott, Mag,J.) Docket, 10 cr 00184, Doc. 291, filed 9/8/11.

[12] Inexplicably, no one from the government ever got in touch with Maxine Rye, office manager of Amerindo UK in London where Renata Tanaka was running the Panama fund, between the time the defendants were arrested, in May 2005, and 2008 (Rye Dep. T. 193-94):

> Q. And you were afraid that the same thing [as happened to Gary] could possibly happen to you, that you could be charged and be separated from your family and your children for three plus years awaiting a trial, and that's what you were afraid of.

> A. No, no. No, I wasn't. I wasn't at all. To be honest, I thought nothing -- the fact that nobody did come and talk to me about how the office and stuff of that, I did think that was a bit strange because, you know, I thought that someone would have been interested. But no one got in touch with me, so it wasn't like I was scared of anything happening to me, not at all. (Rye cross T. 193-94)

37

**Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-2**

Mr. Farhinger's prediction was right. With respect to each claim in this Brief, Mr. Fahringer failed to challenge evidence, present evidence, and/or advocate for his client. This record demonstrates that Counsel's representation of Mr. Vilar failed under an objective standard of reasonableness, *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Strickland's "prevailing professional norms" baseline, *id.* at 88, means at a minimum that a lawyer must be prepared on the law and the facts. This *minimum* in the law of Sixth Amendment ineffectiveness was not provided here.

In this Point One we set forth general areas in which Mr. Fahringer's performance was ineffective. In later Points of this Brief, we develop this further, with references to proposed and pre-marked Government Exhibits on a disc turned over on July 9, 2008, and marked 3500 material turned over on a disc dated September 2nd. (The parties stipulated that three CDs -- one containing the approximately 3,000 pre-marked exhibits turned over on July 9, 2008, one containing government 3500 material turned over on September 2, 2008, and one

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-3

containing additional proposed government exhibits disclosed in August 2008 -- are part of the appellate record.)

### Inadequate Review of Discovery and 3500 Material

Counsel did not adequately review the material in preparation of a defense.   An effective investigation would have provided the defendant "with a trial significantly different than [h]e might have received if represented by a competent attorney." *Williams v. Washington*, 59 F.3d 673, 682-685 (7th Cir. 1995) ("Counsel's lack of familiarity with the case, combined with his failure to investigate, provided [the defendant] with a trial significantly different than she might have received if represented by a competent attorney.")

Mr. Vilar's initial counsel successfully litigated a suppression motion from 2005-07, achieving a ruling by Judge Karas that the search of Amerindo New York offices was unconstitutional and that not even probable cause was shown that "Amerindo" was "permeated with fraud". Unfortunately for Mr. Vilar, attorney Ivan Fisher took over Mr. Vilar's defense (as discussed in our motion for an extension of time), took money, and did little work, because he was too busy with other matters to prepare for Mr. Vilar's trial, telling Mr. Vilar he would

prepare when the government disclosed its evidence and its witness list, which it was ordered to do in the run-up to the trial.

In the face of Fisher's failure to focus on his case, Mr. Vilar hired Herald Fahringer, a fine lawyer but not a magician, four months before trial. Mr. Fahringer appeared on May 28, 2008, and assured the court that he could be prepared for trial on September 8, 2008. Less than six weeks later, he wrote as stated above to request an adjournment of the trial (and asked for the release of bail money for his fees).[13]

He said that new circumstances made effective preparation impossible. The Court released money for Mr. Fahringer's fees, but did not heed his warning about his inability to be prepared for trial.

On July 31, 2008 (Order, A.257), Judge Sullivan adjourned the trial for sixteen days, and granted the government's Rule 15 motion to take depositions in London of Amerindo back office witnesses – a motion the defendants opposed based on the ground of the government's "substantial and unexplained delay" (the case had been indicted three

---

[13]    That letter was not docketed but was referenced in the order releasing $500,000 of Vilar's bail money (posted by friends) to Mr. Fahringer as fees. It is also attached to our motion papers in this Court seeking the extension to do the review work he should have done.

years earlier, in September, 2005.) Once the deposition was granted, counsel faced Maxine Rye, the London office manager who knew about how back office trading, allocation, and money movements were accomplished by Renata and Gary Tanaka – but he did not take advantage of the opportunity to develop evidence, and did not examine her about any of these matters at her deposition.

There were other motions at the same pre-trial period, including a belated motion for the Court review *in camera* certain attorney-client privileged documents from Panama bearing on Count 12, alleging three false statements in a letter to the SEC responding to Lily Cates' complaint. The motions kept Mr. Fahringer busy, but it is plain that he did little document review in preparation for trial. (See Doc. Entries 280, 281, 282, 283, 284, 285, 287; *in limine* ruling, A.274).

Though Mr. Fahringer litigated the motions, he did not mount a defense at trial. He failed to address the actual allegations (in the indictment or being made by prosecutors who varied it), and instead put all the "eggs" he knew about (limited) in a defense "basket" that can be summarized as this:  the defendant is such a remarkable guy, the returns on investments throughout most of the company's history were

41

**Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-6**

"spectacular," so defendant could not have intended to defraud.

All other defenses went undeveloped, and even the lack of intent defense went unsupported.[14]

## Inadequate Development of Viable Defenses

From reading the transcript it is difficult to discern any defense whatsoever offered on behalf of Mr. Vilar. The only "defense" counsel offered as gleaned from his summation is that Mr. Vilar had important clients, was a brilliant Chartered Financial Analyst, was a philanthropist, and the allegedly "fraudulent" (or "sham") investments generated substantial returns. This defense – that such a man could not have intended to engage or engaged in fraud -- was fine, as far as it went, but it did not address the charges in the indictment that the "victims" made their investments based on false and fraudulent representations, that the defendant's conduct constituted mail and wire

---

[14] Although Vilar's surgeries and illnesses were mentioned, counsel did not develop the fact that Vilar was out of the office for lengthy periods in 2002-03, recovering at home from spine surgeries, and a bout of almost deadly peritonitis. In his testimony in a deposition in a civil case for damages incurred by a contractor lined up for the Vilar-funded "Maazel/Vilar Conductors' Competition Foundation (U-GX-1801 (April 21, 2005) and 1802 (July 16, 2003), Vilar complained repeatedly that he had been "incapacitated" during that period (U-GX-1802, p.98, 118).

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-7

fraud, as well as securities fraud and money laundering, and that he had lied to the SEC about Amerindo Panama. Mr. Vilar's counsel barely addressed the elements of the offenses and he failed to point out, focus on, or offer evidence that explained or contradicted the charges.

This absence of a defense allowed and invited counsel for Vilar's business partner and co-defendant, Gary Tanaka, to blame things on Vilar because Vilar, as the "face" of Amerindo, had signed communications to clients and letters to the SEC. (Counsel failed to show that Tanaka signed both authorizations on Bear Stearns-held Panama accounts claimed to have been used for money laundering and wire fraud transactions and payments to clients, to Vilar, and Amerindo in this case.)

Vilar's counsel failed to develop that this strict control of the purse strings by Tanaka meant that only Tanaka could authorize the transfer of, and transferred, funds between commingled accounts and decide what and when to pay Cates or others (including Vilar, his charities, and Amerindo itself) who were waiting for payments. Vilar could not effectuate a payment for a GFRDA investor, for Cates, or even to himself unless Tanaka agreed and then did it.

43

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-8

Instead of using evidence to Vilar's advantage to *dis*prove a "conspiracy" in which (according to the government) anything done by "Amerindo" was done by "Vilar," Mr. Fahringer hurt the defense by objecting to it. When the Lisa Mayer (Vilar's one-time girlfriend and a GFRDA investor) started to talk about how Vilar had told her she must choose between him and Renata Tanaka years earlier, Mr. Fahringer *objected* and successfully kept out testimony that would have separated Vilar from any decision to pay, or not to pay, any particular investor.

He also failed to develop testimony (based on 3500 statements by witness Stephen Gray, a tenant of, and attorney for, Amerindo in London) that would have established for the jury that Renata Tanaka ran the show, and Vilar had little say in what the "back office" did. He had to wait for Tanaka (or Renata) to prepare client statements (based on Net Asset Values of funds in which they participated, as per records kept by London), to achieve payments on the investments (or reach settlements with investors), and indeed, to pay (or not) Vilar's charitable pledges. The *fact* that Vilar *defaulted* on pledges and on his mortgage despite a plethora or internal memoranda pleading with Tanaka for money, indeed proves the point that he had no control at all.

44

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-9

## Failure to Cross Examine and Failure to Offer a Defense

Mr. Vilar's counsel did minimal cross-examination of government's witnesses — even of Lily Cates, whose relationship with Vilar and whose interpretation of a line he spoke here or there years earlier became of central importance to the case. Fahringer did not go beyond general questions designed to elicit that investors had received substantial returns on their investments.[15]

The government's two main witnesses, Lisa Mayer and Lily Cates, were long time investors, whose primary relationship was with Vilar. Lisa Mayer had dated Vilar. With Cates, Vilar had a long-standing relationship. In cross-examining Cates, Tanaka's counsel focused almost exclusively on how she had dealt only with Vilar, not Tanaka, who was in London. Vilar's counsel allowed Tanaka's counsel to shift "blame" to Vilar on this basis, though it was Tanaka who directed business (except that of the U.S. Company, about which there were no

---

[15] Even as to this favorable evidence, it was <u>not</u> Vilar's counsel, but Tanaka's counsel, who primarily introduced the evidence and cross-examined the witnesses about their investment return during a period of almost 18 years.

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-10

charges of wrongdoing.)[16]

Counsel could have demonstrated Tanaka's authority and control over financial matters through cross-examination of the government's witnesses. He did not do so. We offer some examples:

(1) Daniel Chapey, Darren Leavitt, and Anthony Ciulla, all Amerindo employees in San Francisco office: Chapey testified on direct that Vilar was a market analyst and the face of the company, while Tanaka was the one who actually did trading. Fahringer asked Chapey only one question and did no cross of Leavitt or Ciulla, failing to take advantage of opportunities to show that Tanaka handled the financial activity of the non-U.S. company entirely. This evidence would have been highly exculpatory of Vilar, and would have stopped Tanaka's counsel's efforts to "shift" blame to Vilar, and instead would have fostered the *true* defense that there may have been "blame" but not criminal fraud "blame" on the part of either of them.

(2) Carlos Castellanos, former Amerindo employee who headed efforts to achieve an SBIC application: Fahringer had a wealth of

---

[16]Tanaka was acquitted of the substantive Securities Fraud count related to Cates, though convicted of the Count One conspiracy.

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-11

materials to use to show Castellanos's control over what Vilar and Tanaka were hearing about a technology venture in the works that came to be known as "the SBIC." Castellanos called this "the SBIC" as a shortcut for a Venture that was actually named the "Amerindo Technology Ventures I LP". U-GX-4004 is a memo from "Carlos" to defendants dated April 12, 2001, "subject" "Amerindo Technology Ventures I LP (the SBIC)", in which Castellanos "proposed" to submit "final paperwork for licensing showing the regulatory minimum of $10 million, of which $6,500,000 would be put up by Amerindo U.S." (Castellanos wanted to "move aggressively" to raise $50 million for limited partnerships interests, and reported he was doing so with "a number of interested, high net worth individuals, including one who owns and operates a very successful participating securities SBIC.")

At trial, Fahringer let the matter sound like a "sham" and did not cross-examine Castellanos or seek the introduction of documents to develop the legitimacy and long-term nature of this investment.

(3) Michael Nierva, Bear Stearns and then J.P. Morgan: Nierva's direct and re-direct were 125 pages. Tanaka's counsel's questioning spanned 49 pages. (T. 3660 – 3708; 3729). Fahringer did no cross.

47

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-12

Fahringer, instead, objected to documents that could have been used to Vilar's benefit. The Court overruled his continuous objections and at one point called a sidebar to ask Fahringer why he kept objecting on relevancy grounds, to which Fahringer responded that he wanted to establish his position that documents signed by Tanaka coming from London should not automatically bind Vilar. (T. 3511-3513) Even after the sidebar, Fahringer continued to object and the court continued to overrule him. He never asked for a limiting instruction, something Tanaka's counsel frequently obtained. Nor did he use the documents, once admitted, to examine the margin trading structure of which Cates' money was a part to show it was a part of a mutually beneficial endeavor in which money in various sub-accounts were pooled for margin trading.

Despite telegraphing to the jury his concerns about this witness through his objections, Fahringer did no cross-examination of Nierva. Given that Nierva was the witness through whom the government introduced documents showing the transfers of funds from Cates into Vilar's personal account, a point Tanaka hammered on through cross-examination, Fahringer's failures establish and document that Vilar did

48

not have (and seemingly did not want) control over, getting and sending out letters of authorization for fund transfers, were key to Vilar's conviction on all counts. (This line of defense would show that if anyone, Tanaka or Renata Tanaka, not Vilar, committed (mis)conduct twice, a year apart, executing transfers using a pasted signature of Lily Cates (that the government argued was "stolen" but did not show). )

The government's theory that defendants decided to steal from Lily Cates in order to pay off the GFRDA investors would have been refuted by a showing that there was plenty of money in the accounts to pay back the GFRDA investors, and counsel should have given the jury this important information. Counsel could have and should have used this witness, familiar with Bear Stearns records, to elicit that tens of millions of dollars were in Amerindo accounts (not Amerindo U.S. accounts) in the form of cash, public and private securities, and this could have been used by Tanaka, who controlled the accounts, to redeem investor funds.

(4) Erica Glenn, paralegal at US Attorneys Office: Fahringer asked only a single question of Ms. Glenn (T.4493), through whom the government introduced numerous documents showing Vilar pleading

49

**Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-14**

with Tanaka to release money so that he could pay his bills and charitable pledges (T.4453-4468).    Fahringer could and should have used these documents affirmatively, especially after Colton made it a point to show that there was no evidence of Tanaka taking money (it was always "Vilar" took the money).  These requests by Vilar could have been used to show that Tanaka controlled the purse strings, and to such an extent that Vilar had to ask Tanaka for money even to pay his ordinary household bills.

There was, further, no evidence that Vilar knew exactly where Tanaka was taking money to transfer to him.  He knew he was getting money; he knew he deserved money for running Amerindo and had come to get used to having to rely on Tanaka.  All Vilar knew was that, when he was able to attract investor funds, Tanaka was willing to release money to him.  This is no different than any business where compensation is tied to business generated, and Vilar's counsel should have argued that.

(5) Stephen Gray , attorney in the UK who referred GFRD clients: Gray testified on direct and re-direct for approximately 100 pages. Colton's cross-examination spanned 150 pages.  Fahringer did no cross-

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-15

examination.

Through elemental Googling of Stephen Gray, the defense could have turned upside down the government's suggestion that the whole concept of "offshore investments" was shady and so must have been a fraud on investors, as opposed to *for* investors.   Gray would have testified that the products his clients purchased were part of a widespread tax management strategy used for high value clients, which was Gray's (and Vilar and the Tanakas') specialty.   The reality of the world in which Gray and Amerindo London operated, indeed, would have opened eyes (of the prosecutor, as well as the jury).

The search terms "Stephen Gray attorney" would have turned up or led to a website that, if used as a basis for cross, would have yielded information about what tax professionals and fund managers do for a living.   Gray – who identified himself as having been Amerindo London's tax counsel (and also counsel for an agent of clients investing through Amerindo's offshore products) -- serves as a Committee Member" of a Group that identifies itself as "the ITPA" on a website entitled "Electronic Information for Tax Professionals (@itpa.org). http://www.itpa.org/history.html   ITPA describes itself as a "multi-

51

**Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-16**

disciplined association of over 1000 bankers, trust officers, finance directors, accountants, lawyers and others with a practical interest in the tax aspects of cross-frontier transactions." It promises: "We examine our subject mostly from the point of view of the taxpayer; membership is limited to practitioners who act for or in the interests of taxpayers. We were founded in 1975 and are the only association devoted solely to the study of this subject." http://www.itpa.org/history.html   A member is benefited by being able to "view on our website, or download if he wishes, any part of the **Portfolio of Laws**, which contains the trust laws and company laws and other relevant laws and tax treaties of the major offshore jurisdictions (and see under Tax Treaties below)." Gray thus could have explained how creating financial identities that hold up for "tax purposes" is a reality of the financial world in which Vilar and Tanaka operated.

(6) Graciela Lecube-Chavez, GFRD investor:  Lecube-Chavez, an 82-year-old frail retiree who testified she had had to *beg* Alberto Vilar and Renata Tanaka for her money which was being held in her Amerindo account was the worst type of witness for the defendant . She

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-17

was a friend of Vilar's mother, had spoken to Vilar to purchase the investment in 1989, and claimed that she did not pay taxes on income from her investment "on the advice of Vilar." Instead of cross examining and showing how her dealings with Renata Tanka in London led to an acceptable settlement of her affairs, Fahringer asked her no questions (T.361-412, 456).

(7) Lisa Mayer, GFRDA "victim": Cross by Mr. Fahringer was 21 pages (T.1160 – 1180; 1469); Colton's cross was 210 pages.

One of the two main witnesses against Mr. Vilar was Lisa Mayer, an investor who had dated Mr. Vilar, and who was induced to say that she had told Mr. Vilar when she first invested how important it was to have her family's money in safe, conservative, government instruments.

When it came time to cross-examine Lisa Mayer, Fahringer told the court that he had recently started wearing a hearing aid two months ago, that he was having battery trouble, that he had not heard a lot of her testimony, and; that he could not at that point do an effective cross-examination. The court agreed to adjourn for the day. (T.994, 1016)

The next day, Fahringer's co-counsel, Erica Dubno, reported that

53

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-18

Fahringer was in the hospital with cardiac symptoms. Upon Dubno's representation that she would not know where to make objections if Colton began his cross-examination of Mayer (T. 1067), the court agreed to spend the day addressing legal issues (affecting both defendants, despite the absence of Vilar's lead counsel).

When Fahringer ultimately conducted an extremely brief cross-examination of Mayer, he did not address her personal relationship with Vilar, which could have been used to show that she made her investments based on her personal trust in him, rather than based on anything specific he purportedly said about the investment product. Fahringer did not bring out – despite Amerindo documents supporting this line of defense – that Mayer did not care how her family funds were invested: she (and her family) invested, essentially, in Alberto Vilar and Gary Tanaka, who personally *guaranteed* their GFRDA investments, above and beyond the Amerindo's corporate guarantee (guarantees which they have never disclaimed to this day).

After the Mayers' initial investment in the GFRDA product, when Lisa Mayer thereafter inherited money from her mother's estate, she chose to invest it in a riskier equity fund -- Amerindo's ATGF product –

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-19

as to which the government did *not* charge fraud.  This testimony, if properly developed and argued, would have supported the defense of immateriality:  investing in government instruments was not important to Mayer or her family, and her testimony to the contrary was motivated by the fact that the Mayers were concerned about liability for their failure to pay taxes. (Mayer testified that the first time she spoke to the government in 2005, she did so under a proffer agreement that her statements would not be used against her. Three months later, she filed amended tax returns, Tr. 1309-1313, shamelessly blaming "Vilar's fraud" for the Mayer family's tax delinquencies, GX 901-10.)[17]

---

[17] In August 2005 the Mayer family filed returns for five years.  This explanation is added as a Note on each return (U-GX 901 *et seq.*):

> Beginning in the 1991 tax year, the taxpayer invested certain sums with Alberto Vilar and his Amerindo Companies. The taxpayer received and relied on the advice of Alberto Vilar and his group of attorneys, advisors and accountants in establishing the subject investment vehicle, administering the same, and for reporting the tax treatment of distributions, if any.
> As a result of the massive fraud alleged to have been undertaken by Vilar with respect to the Amerindo Companies, of which the taxpayer is one of the victims, the distributions received by the taxpayer prior to the taxable year in issue have been treated or reported as a return of capital. The amount reflected on the subject return is

55

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-20

When Tanaka's counsel (not Vilar's) brought out that the Mayers did not pay taxes on the substantial returns they received from their offshore investments, Fahringer actually *objected* on the ground that the testimony prejudiced Vilar because it involved Vilar purportedly giving the Mayers tax advice. This testimony only "prejudiced" Vilar to the extent that his counsel failed to show that offshore investing is a common tax management strategy and that there was nothing wrong, *as the government acknowledged,* with the tax advice Vilar purportedly gave. (T.1268-1277). (Perhaps the government overstated the case and really meant to do a tax prosecution. Its perpetrators, however, were the "victims".) Indeed, witness Lecube-Chavez had also testified that Vilar gave her tax advice, and there also, the government stated that Vilar's giving of tax advice was not part of or in furtherance of the alleged scheme. (T.412-455) Fahringer should have anticipated that Colton would bring up the tax issue in his cross-examination – since it

---

similarly being reported as a return of capital, resulting in a reduction of the remaining outstanding principal balance of the taxpayer's Amerindo investment (as reported herein). To the extent any distributions are received in subsequent taxable years in excess of the remaining investment amount, said excess will be reported as ordinary income.

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-21

is the most basic form of impeachment – and prepared to defend against any suggestion that Vilar did something wrong in his discussions with Lisa Mayer about her tax situation.  He should have aggressively shown that Lisa Mayer and her family knew well what they were doing when they entered into offshore transactions "with Vilar".

There were other failures to cross examine, for instance:

(8)  Nicholas Ciriello, Tara Colburn trustee:  Fahringer asked Ciriello (Tara Colburn's executor) only two questions.

(9)  Dalys Donoso, former employee of Berguido law firm in Panama.    (No cross by Fahringer)    Her testimony about the "mail drop" corporation created a "stink" that should have been countered with a defense based on the *legitimacy* (or at least acceptability) of "offshore" corporations and identities.

Fahringer *also* made no argument under Federal Rule of Evidence 403 concerning this or practically any other evidence offered.

(10) Lily Cates –   We discuss Cates' lack of cross examination (Mr. Fahringer's cross covered 33 pages (2205 – 2238), in contrast to Colton's cross of  65 pages) in Point Four of this Brief.

(10) Maurice Kassimir - Lily Cates' attorney.  Mr. Fahringer asked

57

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-22

two questions (2358).

And (11) Ed Swanson, Cates' lawyer who had represented Cates in an arbitration between Cates and her Merrill Lynch broker in 1992-93, where Vilar testified as an expert witness and told Swanson to steer clear of questions about Rhodes Capital because it was "offshore." Further questioning about this proceeding would have targeted Cates' cunning and her ability to switch gears when her money was involved.

### Failure to Advocate Count 12 Defenses Or To Move To Sever

Count 12 (of which Tanaka was acquitted) accused the defendants of violating 18 U.S.C. § 1001 by making false statements to the SEC in a letter dated May 20, 2005 (GX 921) – the letter that sparked the U.S. Attorney to move in and indict immediately.    There are three specifications of "false statements" in the Court, dealing with *ownership* of Amerindo Panama, about which the SEC had asked after Vilar made the huge mistake of humiliating Lily Cates by telling her that she would have to make a demand on Amerindo Panama, of which she was a client, in order to close her account and get money back from the investment in the SBIC and her other holdings.

Focused on an attorney-client privilege issue instead of the

58

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-23

substantive offense itself, Mr. Fahringer made no argument about the May 20 2005 letter except that Amerindo counsel had been involved in its preparation. Mr. Fahringer did not even try to defend on the ground that the statements were literally true, and/or *believed* by Mr. Vilar to be true, or were immaterial to the SEC (because it knew that Alberto and Gary had control of Amerindo Panama and could effectuate the release of private funds and were doing so), and because in the second part of the letter Vilar stated that he knew Amerindo Panama would comply and that Vilar would help effectuate her instruction.

Fahringer also did not move to sever when the evidence concerning "Panama" overwhelmed the trial, nor defended against the innuendo that there was something "wrong" with offshore and with mail drop offices in Panama and other shenanigans that businesses lawfully play. See http://treasureislands.org and the website of witness Stephen Gray ( www.itpa.org).

### Failure to Advocate for His Client in Summation

The government's summation and rebuttal consumed 105 pages of transcript. Tanaka's counsel's summation spanned 100 pages.

Fahringer's was 25 pages and his keynote was that the U.S.

Exhibit A -Vilar Appeal Brief (DOC 178, 10-521),A-24

investment funds (*not* charged in the indictment) had done "spectacularly" well. Mr. Fahringer barely addressed the elements of the offenses and he failed to point out, focus on or offer arguments that contradicted the charges. He also failed to challenge numerous erroneous jury instructions discussed in the points below.

There may be reasons why Mr. Fahringer did not get to the documents, or the law, and prepare a defense. Regardless, the Constitutional right to an "effective" defense is one belonging to the client, not the overworked or surprised lawyer who can excuse poor performance for any reason.

The Court should have granted an adjournment. The government should not have charged as it did (or at all, because it intruded in civil disputes). But in the end, counsel should have prepared and challenged evidence, theory, and proof. Mr. Vilar suffered Constitutionally subpar assistance. His convictions must be reversed on this ground alone.

## POINT II

### THE STATUTE OF LIMITATIONS PLAINLY BARRED PROSECUTION OF COUNT THREE, THE "GFRDA FRAUD"

The statute of limitations for securities fraud is five years. *United*

60

**The Government's Fictional Narrative: Lily Cates Was Not Defrauded; She Was A Sophisticated Investor Who Knowingly Invested With Amerindo Offshore**

The Government propped up its charge of securities fraud in connection with Cates' purchase of SBIC by creating a series of fictions – all of which could have, and should have, been dispelled by effective counsel.   There were essentially three parts to the Government's narrative:  (1) when soliciting her investment in SBIC, Vilar lied and told Cates that an SBA license had already been secured; (2) defendants intentionally tried to confuse Cates (and other investors in other offshore investments) about the entity that would be holding and managing her money, and misled Cates about the offshore nature of the entity; and, (3) the SBIC investment fund, "in reality, never existed" and after she invested in it, defendants "stole" her money.   In summation, the prosecutor used motive as the glue that put the other pieces of the narrative together:  he argued that Vilar had solicited Cates in June 2002 because defendants needed an infusion of cash so that they could satisfy a variety of obligations, and "So faced with these growing obligations, what did the defendants do?  They defrauded Lily Cates by lying to her and then stealing her money." (T. 5283)

**Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-1**

Each part of this narrative is built on a false portrayal of both Cates and the way she did business, and a false portrayal of Amerindo and the way it did business. Again, counsel could have – and should have – exposed the Government's multiple misrepresentations (and the Government should not have hid the truth in the first place.)

• There Was No "Lie" About The License

According to the Government, "Vilar falsely represented [to Cates] that he and Tanaka had been approved for an SBA license for an SBIC." (GB 107) In our initial brief, we showed that this "lie about the license" was an invention. Cates did *not* say that Vilar told her that the SBA had granted a license (much less that it was an important term of the investment, the details of which, because of her severe dyslexia, she did not want or need to understand). Cates did not even use the word "license" when she testified. Rather, she offered only the vague, "Oh it was done – it's already done."

Notably, we also showed, the two professionals working on Cates' behalf to rescind her SBIC investment (her lawyer, Ed Swanson who brought the matter to the attention of the SEC and the Justice Department, and Bear Stearns broker, Eugene Ross) also contradicted

Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-2

the Government's "already licensed" claim. Neither had asserted before trial or in connection with the rescission effort that Cates had been deceived about the license. (VB 77-81).

A fuller collection of all 3500 statements by Cates and Swanson in our Supplemental Appendix, VSA volumes I and II, shows that Cates' concern with SBIC was that she wanted to get her money out of it, and that she was having "problems" redeeming.

Cates herself did not claim she had been defrauded, or was unsophisticated, or led to believe this was in an investment in a venture that was already licensed. Here are the Government's notes of what she when interviewed about the SBIC investment:

this meeting, Vilar asked Cates to give $5 million from her Bear Sterns account to be placed into a new venture that Cates knew only as "involving the government and small business" (later referred to as the SBIC investment). Upon replying that



Rather, attorney Swanson, knowing that Cates had invested in a private venture and that her qualifications as an investor had mattered, relied on the "technicality" that she had not been given GX-265 (the private placement memorandum) and that on this basis she was

31

**Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-3**

entitled to rescission. (Among Cates' files there was also UGX-262, a power point presentation dated after her purchase, that is, in 2003, advising that investors must be qualified, that this private venture was for a 10-year term with shares not transferable.)[9]

Cates chose to invest with Vilar and Tanaka not because of any representations about the state of the license, but, rather, because she wanted to be their partner in the "big" Amerindo and there was some deal (not fully developed) afoot. She had enjoyed a long history of successful investing and just previously to the discussion of SBIC had received $10 million from her late husband's estate (*e.g.,* Ross UGX-

_____

[9] In a footnote (GB 112 n.*) the government dismisses the significance of the private placement memo, arguing that, even if the private placement memorandum "existed," this memo itself could not have put Cates on notice of the risks of the SBIC investment because it was obtained after she invested. We did not bring up "the existence" of GX-265 to suggest that *it* gave Cates "notice" of "the risk." Cates had already told the government at her first two interview sessions – and her attorney told them as well – that she was dyslexic and did not want to read anything. She relied on Swanson, as she relied on Ross and others before them, and she relied on Vilar because he had made her a fortune. Rather, we cited GX-265 because it explained the terms of the investment that Cates, and then Swanson, had understood completely. That is why both took the position that Cates could rescind the purchase because (Swanson said, based on Cates' selective production to him) she had not been provided with the offering documents prior to investing. (This was a civil litigation "defense" to an otherwise irrevocable investment).

Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-4

3510-2 (VSA-164); and UGX-3505-18, Swanson's first explanation to AUSA Litt on April 18, 2005) (VSA 341). Cates talked to every one of her advisers about this money; she ended up investing half with Ross at Bear Stearns, and used the other half, the $5 million, to get an "in" on Vilar's next private equity venture, which came to be called the SBIC. [10]

There was nothing hidden from Cates, who, according to her own letter to Vilar (whom she called her "Cuban brother") in which she commiserated with him about his travails, knew she was investing at the bottom of the market (GX-3350-40, VA (initial Appendix) 402). (Watching as Vilar was trashed when he failed to fund charitable

---

[10] Notes of the Ross interview stated (VSA 164):

> rd'd a settlement w husband
> $10 M w/Morgan Stanley
> 5/02- shortly thereafter she needed cash to invest $ 5 million to invest w/AV-doesn't recall whether it had to do w/Rhodes Capital or similar to it"

The Government buried this important information from Ross, gained in an interview weeks after the arrests, because it did not conform with the assumption that Vilar had "solicited" the investment as opposed to the hungry Cates wanting in on more (and knowing that she could always repudiate just as, we show below, she had done in an arbitration with her prior broker where she concealed "Rhodes" to support her lack of "sophistication"). Cates was a happy Rhodes client and it was she, flush with $10 million from her husband's estate, who used it to become an Amerindo insider.

pledges, she was upset that people had "humiliated and soiled your good name (whether your Ego got in your way or not"). She knew with whom she was dealing, had a deal to become his partner, and wanted to "sit in on some meetings just to watch you as an insider". *Id.*)

- Cates Was Not Misled About Where Her Money Would Be Managed

For its own reasons, the Government created the fiction that defendants had intentionally "confused" Cates (and other investors) about the "true identity of the investment adviser" with which she was dealing by "deliberately" giving "Amerindo Panama a name that differed from that of its U.S. counterpart only by the addition of a comma." (GB 5)   It then advanced the utterly false impression that Cates had had no idea that her money was held offshore.

The notion that Cates (or any other of the high net-worth investors who found Amerindo and its offshore operation) was confused by a comma in the Panama company's name would be laughable if this matter were not so serious.   Indeed, it is no wonder that the Government's statement -- that defendants used the comma to "confuse" investors -- is not supported by any citation (GB 5) because no investor so testified.

Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-6

Cates testified that she hadn't noticed the comma at all (which meant that, though it may have confused regulators, it had meant nothing to Cates). Not content with that, the Government induced Lily Cates to lie. She testified (T.2075-76):

> Q. Now, the earlier one ending August 31, '95, the name of the  company there is Amerindo Investment Advisers, Inc., right?
>
> A. Yes.
>
> Q. And the one on the right for September 30, '95, is Amerindo Investment Advisers, Inc., is that right?
>
> A. Yes.
>
> Q. Do you notice a comma between the advisers and the Inc. on one?
>
> A. Yes, I see it.
>
> Q. On the right?
>
> A. Yes.
>
> Q. Is that comma present on the one on the left?
>
> A. No.
>
> Q. Now, the address given on the one on the right, where is that?
>
> A. S-U-C-R- -- I don't know how to pronounce it, but it's a post office box in Panama.
>
> Q. Did you notice that comma and the change of address at the time when you received this document?
>
> A. No. As a matter of fact, I didn't even notice the change of address, much less the comma.
>
> Q. Did you ever have any dealings with anybody from Amerindo in Panama?

Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-7

A. Never.

Q. *Were you ever — up until 2005 were you ever told anything about Amerindo Panama?*

A. *No.* [emphasis added T. 2075-76]

Cates was led to so testify, but as established plainly by unoffered Government exhibits, she was led to lie. In fact, shortly after she received the September 1995 statement about which she testified, *she wrote directly to "Amerindo Investment Advisors, Inc." at the Panama address* to request the redemption of and to provide instructions for the payment of part of her investment. Shortly thereafter, Cates received specific instructions from Renata in London that correspondence concerning her Amerindo investments should be marked "Strictly Private & Confidential – Please forward to Renata" if she chose to mail it to Amerindo's New York Office. (UGX-202,200; VSA 55 and 56).

Any doubt that Cates lied when she professed to have not *known* about Panama is dispelled by more than a decade's worth of Cates' account statements (GX-105) and client confirmations (VSA 57 *et seq.*) reporting investments in offshore Amerindo funds starting in 1987.

The earliest of Cates' investments were in funds called "Amerindo International Venture Fund I" (ATGF I) and "Amerindo International

36

Venture Fund II" (ATGF II); later investments were made for Cates in Rhodes Capital and SBIC. The Government obtained copies of Offering Circulars Cates had received regarding ATGF II (UGX-101, -102; VSA 1-42). Bearing Cates' handwritten notations ("Equity Stock Portfolio", appearing at VSA 23; and "1/85" on VSA-24)), these Circulars state front and center: "The Fund was incorporated in January 1985 in Panama, Republic of Panama. It is an investment company organized as an exempted company under the laws of Panama and is constituted for an unlimited term." References to Panama permeate: The Circulars explain (*inter* alia) that the offices of the fund will be in Panama, provide the Panamanian address, and direct that all communications by shareholders with the Fund should be addressed there. Lo and behold, this is just what Cates did when she decided to redeem her ATGF investment in 1995. (VSA 56 (UGX-200))

There is no doubt that Cates understood what was required of her in these investment with Amerindo Panama, and that opportunities offered by Vilar and Tanaka were great. The first documents provided to Cates made appropriate disclosures and explained explicitly defendants' cutting-edge investment strategies. This formed the *real*

Exhibit B- Vilar Reply Brf. (DOC 271, 10-521), B-9